**BLADY WORKFORCE LAW GROUP LLP**
I. BENJAMIN BLADY — Cal. Bar No. 162470
5757 Wilshire Boulevard, Suite 535
Los Angeles, CA 90036
Phone: (323) 933-1352
Email: bblady@bwlawgroup.com

**LESCHES LAW**
LEVI LESCHES — Cal. Bar No. 305173
5757 Wilshire Boulevard, Suite 535
Los Angeles, CA 90036
Phone: (323) 900-0580
Email: levi@lescheslaw.com

ATTORNEYS FOR
Plaintiff DOE, individually, and for
PEOPLE OF THE STATE OF CALIFORNIA

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DOE, individually, and on behalf of all others similarly situated;<br><br>    Plaintiffs,<br><br>  v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA, a California Not-for-Profit Corporation; DOES 1 through 20.<br><br>    Defendant. | <u>**Class Action**</u><br><br>**COMPLAINT FOR:**<br><br>**(1)** **LANHAM ACT VIOLATIONS;**<br><br>**(2)** **UCL § 17200 INJUNCTION (CAL B&P § 14259);**<br><br>**(3)** **TITLE IX DISCRIMINATION / RETALIATION;**<br><br>**(4)** **NEGLIGENT HIRING / SUPERVISION / RETENTION** |

COMPLAINT — JURY TRIAL DEMANDED

(5) **RESCISSION AND/OR AVOIDANCE AND/OR UCL § 17200 INJUNCTION AGAINST FRAUDULENTLY INDUCED AND/OR UNCONSCIONABLE ARBITRATION AGREEMENT;**

(6) **[CLASS CLAIM]**

**AVOIDANCE AND/OR UCL § 17200 INJUNCTION AGAINST FRAUDULENTLY INDUCED AND/OR UNCONSCIONABLE ARBITRATION AGREEMENTS**

**JURY TRIAL DEMANDED**

**Plaintiff DOE, in his/her personal capacity, and on behalf of all others similarly situated, and demanding a Jury Trial on all Causes of Action, alleges:**

## JURISDICTION & VENUE

1.     **Plaintiff DOE ("DOE")**, at the time of filing, and at all times relevant to the Lanham Act Cause of Action herein, is and was a resident, domiciliary, and citizen of California, with his/her primary place of residence in Los Angeles County. Plaintiff was employed in the state of California.

2.     **Defendant UNIVERSITY OF SOUTHERN CALIFORNIA ("USC")** is a not-for-profit corporation organized under the laws of the State of California, with its principal mailing address located at 3551 Trousdale Parkway, ADM 352, Los Angeles, CA 90089, as identified through Defendant USC's filings with the California Secretary of State.  USC is subject to numerous federal laws

1  including but not limited to Title VII, Title IX, the Defense Appropriation Act of
2  2010.

3        3.      Federal jurisdiction over this action arises pursuant to section 1331 of
4  title 28 of the *United States Code* and pursuant to section 1121 of title 15 of such
5  Code.

6        4.      Because "part of the events or omissions giving rise to the claim"
7  occurred in the Central District for the State of California, venue in this Court is
8  appropriate pursuant to subdivision (b)(2) of section 1391 of title 28 of the *United*
9  *States Code*.

10       5.      Defendants are subject to personal jurisdiction in this district and state
11 because they are domiciled therein.

12                              **GENERAL ALLEGATIONS**

13       6.      Plaintiff is a licensed attorney.  Plaintiff has extensive experience in
14 conducting investigations, including workplace investigations.

15       7.      In or about March 2018, Defendant USC hired Plaintiff to be a "Senior
16 Investigator" in USC's newly formed Office of Conduct, Accountability, and
17 Professionalism ("OCAP").  Plaintiff continues to be employed as an OCAP Senior
18 Investigator.

19       8.      Defendant USC represented to Plaintiff that OCAP was Defendant's
20 internal department for investigating allegations of workplace misconduct that were
21 only alleged violations of USC policy and that did **not** allege statutorily protected
22 conduct (*i.e.* did not raise concerns regarding conduct that would warrant protection
23 under Title VII, under the California Fair Housing and Employment Act, under
24 *California Labor Code* § 1102.5, or under similar statutes and regulations).

25       9.      Thereafter, Defendant USC assigned Plaintiff to investigate two Title IX
26 complaints.  Defendant did so even though Defendant knew—and Plaintiff informed
27 Defendant—that Plaintiff was **not** trained as a Title IX investigator under USC

28

COMPLAINT — JURY TRIAL DEMANDED

policies.  Plaintiff is informed that Defendant USC knew Plaintiff was not trained in accordance with USC's obligations under the terms of its Consent Decree with the United States Department of Education, Office of Civil Rights ("OCR").

10.     Plaintiff, as an investigator would interview witnesses, collect and review evidence, and make findings regarding violations of University policy.

11.     Plaintiff, in the course of conducting an investigation, would compile investigative reports based on the witnesses he/she had interviewed and the evidence he/she had reviewed.

12.     Plaintiff expected that he/she would make factual findings regarding the credibility of witnesses, the congruence of differing narratives, and other subtleties that required the eye and judgment of a trained professional who had observed the witnesses being interviewed and compared all the evidence.

13.     Plaintiff expected that, based on his/her review of written Title IX policy, he/she would draft the Summary Administrative Review for investigations in which Plaintiff was the Title IX investigator

14.     Plaintiff had significant experience and training as an investigator.

15.     Plaintiff's investigative reports have been challenged on numerous occasions; no court, however, has ever overturned an investigative outcome by Plaintiff.

16.     When Plaintiff was hired, Plaintiff was required to sign her/his acknowledgement and agreement to Job Code 117113, Senior Investigator-Conduct, Accountability, and Professionalism.

17.     As part of Plaintiff's job duties as a Senior Investigator, Plaintiff was required to "Prepare[] and maintain[] comprehensive reports based on investigative findings."

18.     As part of Plaintiff's job duties as a Senior Investigator, Plaintiff was required to "Track[] completion and necessary follow-up."

19.    Plaintiff was familiar that, as a professional and trained investigator, *Plaintiff*, as the interviewer of all fact witnesses, needed to make factual findings regarding the meaning, veracity, trustworthiness, credibility, and congruence of witness statements and presented evidence.

20.    Plaintiff, as an OCAP investigator, was expected to conduct investigations and, thereafter, assemble a report detailing the evidence found, analyzing that evidence, and reaching an initial determination as to whether "University Policy" had been violated.

21.    After hire, Plaintiff learned that OCAP did not provide an internal process for collegially resolving differences.  This was contrary to the University's warranties that—

> Internal processes are available for collegially resolving differences that may arise between the University of Southern California (the "University") and its faculty or staff, *including formal faculty grievance and staff complaint procedures.* If, for whatever reason, internal collegial processes do not resolve such differences, final and binding impartial arbitration is a means of avoiding the delay, expense, and unpleasantness of a lawsuit.

22.    Plaintiff learned that USC's actual or implied representations concerning an internal collegial process were deceitful and/or fraudulent.  Plaintiff was familiar that, in OCAP investigations, Responding Parties (*i.e.*, the accused parties) were **not** provided adequate procedural protections, and that the Responding Parties were **not** provided the opportunity to review the evidence collected against them and respond against such evidence.

23.    Plaintiff was familiar that, in OCAP investigations, Complaining Parties (*i.e.*, individuals lodging complaints) were **not** provided any adequate procedural protections, and that the Complaining Parties were **not** provided the opportunity to review and rebut any evidence being gathered, or participate in any hearing, so that the Complaining Party might review and monitor the reliability and impartiality of

1   the investigation or determinations.

2   24.   Particularly *due to* the lack of adequate procedural process in OCAP

3   investigations, it was *particularly* important for Plaintiff that he/she, personally,

4   reach factual findings regarding the investigations that he/she conducted and factual

5   determinations regarding the meaning, veracity, trustworthiness, credibility, and

6   congruence of witness statements and evidence he/she received.

7   25.   Without disputing or controverting the authority of her/his superiors to

8   review her/his findings, criticize her/his findings, or require additional investigation,

9   Plaintiff was aware that the role of investigator meant that he/she, personally, needed

10   to make the initial and/or preliminary factual findings regarding the witness

11   statements and evidence he/she received.

12   26.   Plaintiff was aware that her/his role, as the initial finder of fact regarding

13   witnesses he/she interviewed and evidence he/she received, legally required

14   *personally* making assessments regarding the credibility of witnesses based on their

15   demeanor and other similar factors not captured in a "cold record." *Doe v. Westmont*

16   *Coll.*, 34 Cal. App. 5th 622, 637 (2019); *Doe v. Univ. of S. California*, 29 Cal. App.

17   5th 1212, 1233 (2018); *Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055,

18   1070 (2018); *Elkins v. Superior Court*, 41 Cal. 4th 1337, 1356 (2007); *Doe v. Univ.*

19   *of S. California*, 246 Cal. App. 4th 221, 246 (2016); *Fitch v. Comm'n on Judicial*

20   *Performance*, 9 Cal. 4th 552, 556 (1995).

21   27.   Defendant USC, due to protected activity by Plaintiff, retaliated against

22   Plaintiff by, amongst other matters, removing Plaintiff from investigations shortly

23   prior to their completion, and assigning those investigations to other investigators to

24   complete.

25   28.   Plaintiff was informed by management of the importance of politics at

26   USC.  Plaintiff is also informed and believes, in part, that Defendant USC willfully

27   removed Plaintiff from specific investigations due to USC's unfair, unlawful or

28

fraudulent, or its managing agents, desire to protect employees that had engaged in severe or pervasive misconduct.  Plaintiff also alleges USC has a desire to hide unlawful and unethical behavior.

29.  Plaintiff was involved in investigating ("Investigation X") two high ranking USC employees, and Plaintiff received significant and consistent reports of severe and pervasive workplace misconduct (bullying) by those two employees.

30.  Plaintiff provided a status report of to her/his superior, Gretchen Dahlinger-Means, regarding the progress of Investigation X and that, although the investigation was still in progress and pending, there was corroborated evidence that the relevant high-ranking employees had violated University policy.

31.  Thereafter, USC, through its managing agents, Gretchen Dahlinger-Means and Michael Blanton informed Plaintiff she was being placed on a retaliatory administrative leave.  USC removed Plaintiff from Investigation X and assigned the investigation to Nathan Elledge.

32.  Plaintiff provided Nathan Elledge with the notes and interview materials he/she had assembled until that time, after Elledge requested that Plaintiff provide those materials to him.

33.  It is Plaintiff's understanding that Elledge drafted the Report of Investigation for Investigation X.  Plaintiff has never seen the report for Investigation X.

34.  Plaintiff knows that despite the corroborated evidence Plaintiff received regarding misconduct, both the investigated employees have since been *promoted*.

35.  Such outcome is particularly more surprising given Plaintiff's own July 2, 2018 email to Blanton apprising Blanton of the gravity of Investigation X.

36.  At the outset of Investigation X, Gretchen Dahlinger-Means told Plaintiff—who, at that time, was the assigned investigator for the matter—that the complaining employee anticipated termination had made the complaint as an attempt

to avoid the anticipated termination.  No investigation had been conducted at such time, and such statement—made to the assigned investigator, pre-investigation, by USC's Executive Director of workplace investigations, and Title IX compliance, and Title VII and FEHA compliance—appeared to constitute prejudgment.

37.    In the course of the investigation, Plaintiff learned corroborated facts supporting the validity of the complaint.  When Plaintiff communicated those impressions to her superiors, Plaintiff, as stated, was removed from the investigation. The investigation was reassigned, the complaining party was terminated, and the respondents were promoted.

38.    There have been numerous other investigations in which Plaintiff conducted the majority, or vast majority, of the investigation; only for Plaintiff to be pulled off the investigation, and the investigation handed off to another investigator to complete through making supposed findings based on the "cold record," *see Doe v. Westmont Coll.*, 34 Cal. App. 5th 622, 637 (2019), of Plaintiff's notes.

39.    Plaintiff has requested clarification whether Plaintiff's name would be attached to, or listed on, "Summary Administrative Reports."  Defendant advised that Plaintiff's name would be listed on the Report together with Kegan-Allee.

40.    Plaintiff is informed and believes that Plaintiff's name was attached to and/or listed on reports for those investigations in which Plaintiff did not draft the "Report of Investigation."

41.    Plaintiff reasonably has such belief because Plaintiff has been so informed by investigation participants.

42.    Plaintiff reasonably has such belief because, in December 2018, Plaintiff was contacted regarding the status of an appeal by the Respondent in a Title IX investigation wherein Plaintiff had been the investigator, but the Summary Administrative Report had been prepared by another.

43.    Plaintiff reasonably has such belief because months after Plaintiff was

1  removed from an investigation, Plaintiff's Linkedin profile was viewed by the
2  Responding Party's husband.  The viewer had no relationship whatsoever to Plaintiff,
3  and, other than the fact that Plaintiff investigated his partner, there is no reasonable
4  explanation for that review of Plaintiff's Linkedin profile.

5       44.   Plaintiff reasonably has such belief as Plaintiff routinely interviewed the
6  Complaining Party and Responding Party in all investigations she began.  It is logical
7  that the Complaining Party and/or Responding Party, after having spent hours in
8  interviews by Plaintiff, would reasonably object against a Report of Investigation
9  and/or attack a Report of Investigation lacking Plaintiff's name.

10      45.   Plaintiff also alleges he/she has requested such documentation from
11 USC.  USC has stood silent.

12      46.   For such reasons, amongst others, Plaintiff reasonably believes that
13 Plaintiff's name was improperly appended to Reports of Investigation that he/she did
14 not draft, in violation of the Lanham Act.

15      47.   Plaintiff further alleges her common law and statutory tort causes of
16 action herein arise, at least in part, from alleged sexual harassment or assault.

17

18              **FIRST CAUSE OF ACTION**
19              **SECOND CAUSE OF ACTION**
20                 **False Endorsement**
21       **Lanham Act; Cal. Model State Trademark Law**
22       **By Plaintiff DOE, individually, against all Defendants**

23      48.   Plaintiff incorporates ¶ 1 through the current as though fully set forth
24 herein.

25      49.   Plaintiff DOE is an internal investigator with significant experience in
26 investigations, including child abuse and neglect, family law, probate, breach of
27 fiduciary duty, and workplace.

28

50.     Plaintiff has a significant commercial interest in avoiding association with improper and/or scandalous workplace investigations.

51.     Plaintiff, as an investigator, introduces himself/herself by name to each interviewee in an investigation.

52.     Plaintiff's credibility, to witnesses, and to parties in a process, would be significantly undermined if a Google search of Plaintiff's name would associate Plaintiff with court findings of substandard, doctored, and/or overturned investigations.

53.     Plaintiff's ability to obtain future employment would be undermined if a Google search of Plaintiff's name would associate Plaintiff with court findings of substandard, doctored, and/or overturned investigations.

54.     Plaintiff DOE has written/writes significant scholarship regarding organizational biases and workplace harassment.

55.     Plaintiff's credibility as an expert on organizational bias and workplace harassment would be significantly undermined if a Google search of Plaintiff's name would associate Plaintiff with bad and improper examples of organizational bias.

56.

57.     Defendant USC improperly attributed to Plaintiff authorship of "Reports of Investigation" and "Summary Administrative Reviews" that Plaintiff did not author.

58.     Defendant USC has listed Plaintiff as "Investigator One" in Reports, and has published to affected parties Reports that Plaintiff as an investigator.

59.     When a written report designates an individual as the investigator, that designation automatically identifies the named investigator as the author of the report.

60.      Defendant USC has listed Plaintiff as "Investigator One" in Reports:

    a. Without disclosing to affected Parties that Plaintiff was removed from the investigation involuntarily;

b. Without disclosing to the affected Parties that "Investigator One"—*i.e.*, Plaintiff—had never seen, commented on, or been provided any opportunity to review the written report for accuracy.

61.   Plaintiff has further recently learned that Reports on which Plaintiff is identified as "Investigator One" contain statements that Plaintiff would never approve, and contain statements that disguise procedural improprieties that Plaintiff opposed.

62.   Improperly attributing Plaintiff as the author of "Reports of Investigation" and "Summary Administrative Reviews" that Plaintiff, in fact, did not author, would improperly lead a reader to believe that Plaintiff in some way approved or ratified the Report of Investigation when he/she had not even read such Report.

63.   Improperly attributing Plaintiff as the author of "Reports of Investigation" and "Summary Administrative Reviews" that Plaintiff, in fact, did not author, is likely to cause confusion regarding Plaintiff's association with, and/or endorsement of, such Reports of Investigation and/or Summary Administrative Reviews.

## THIRD CAUSE OF ACTION
## TITLE IX DISCRIMINATION / RETALIATION
### By Plaintiff DOE, individually, against all Defendants

64.   Plaintiff incorporates ¶ 1 through the current as though fully set forth herein.

65.   Defendants retaliated against Plaintiff pursuant to Title IX.  Plaintiff opposed Defendant's practices under Title IX, including Defendant's practices of altering and/or ignoring written Title IX investigative procedures for sexual harassment and assault claims.  It was Plaintiff's perception that Defendants were modifying those procedures for purposes of promoting Defendants' preferred outcome.

66.   For instance, in a specific Title IX harassment/assault investigation, Gretchen Dahlinger-Means ordered Plaintiff to conduct the investigative interviews, while representing Kegan Allee-Moawad as the supposed "investigator." Yet, Allee-Moawad would have no interview duties.

67.   Documents presented to the Parties to the investigation formally designated Kegan Allee-Moawad as the supposed "investigator."

68.   As alleged below, Plaintiff is informed and believes that this misrepresentation was in furtherance of Defendant's need to have the investigation controlled by individuals that would subvert the ordinary procedural protections. Even after Plaintiff was removed from the case, another Investigator, other than Allee, was assigned to complete the investigation and draft the Summary Administrative Review.

69.   Plaintiff opposed being an undisclosed investigator whose role would be hidden from one or more interested parties; and when Plaintiff's concerns were ignored, Plaintiff requested to be removed from the Title IX investigation. Gretchen Dahlinger-Means denied Plaintiff's requests. After such requests, Gretchen Dahlinger-Means increased harassing and retaliating against Plaintiff.

70.   Gretchen Dahlinger-Means also attempted forcing Plaintiff to modify written Title IX procedures by excusing a Responding Party in a sexual harassment/assault investigation from providing any evidence prior to Evidence Review. This violated the University's policy, adopted pursuant to regulatory mandate, which required the Respondent to provide documentary evidence *prior* to reviewing witness statements.

71.   Gretchen Dahlinger-Means verbally informed the Allee that the Respondent would not be required to provide evidence prior to evidence review. Allee further advised the Respondent of that fact in writing.

72.   Plaintiff respectfully and tactfully opposed Gretchen Dahlinger-Means's decision to afford the Respondent the opportunity to provide cherrypicked evidence, *after* the investigation was completed and the complete world of evidence

COMPLAINT — JURY TRIAL DEMANDED

assembled against him was made available for his review.  Plaintiff voiced vocal opposition to such practices, but Plaintiff's concerns were ignored and overruled. After such opposition, Gretchen Dahlinger-Means increased harassing and retaliating against Plaintiff.

73.   Significantly, Plaintiff has recently learned facts suggesting that the Summary Administrative Review fails to disclose that the Responding Party was afforded the opportunity to delay in presenting evidence and witnesses until reviewing all the assembled facts.  Adding insult to injury, Plaintiff was turned— without her consent—into a coauthor of a report concealing the very practice she opposed, and was punished for opposing!

74.   Defendants subjected Plaintiff to numerous adverse employment actions; including, without limitation, making false, or deceitful, statements about Plaintiff; denying Plaintiff requested disability accommodations; placing Plaintiff on forced leaves; removing Plaintiff from assignments; denying plaintiff employment benefits; and other harassing and/or discriminatory adverse employment actions.

75.   Plaintiff made a formal complaint that Gretchen Dahlinger-Means was retaliating against Plaintiff for engaging in protected activity arising from Title IX compliance, including on insisting on compliance with the University's written Title IX procedures.

76.   Rather than opening a formal investigation into Plaintiff's complaints pursuant to the protections provided for in the University's mandated written policies for handling complaints regarding protected-class activity, and as required by California law for an allegation of misconduct under the FEHA, the University hired an outside investigator to conduct a noncompliant investigation that failed to afford Plaintiff the adequate (or minimum) procedural rights for a complaint that contains allegations of misconduct.

77.   Denying Plaintiff's procedural rights in investigating Plaintiff's complaint further constituted an adverse employment action.

78.   Plaintiff is informed and alleges that USC also violated various federal

consent agreements.  For example, in violation of §§ A(i) and B(i) and C of a federal Department of Education January 2018 Consent Agreement between the University and the Office of Civil Rights, David Wright, the then-Interim Senior Vice President for Administration affirmed the University's opaque and self-serving mechanisms for determining how complaints would be categorized. Wright admitted Plaintiff's protected or perceived protected conduct, as well as affirming the University's denial of basic due process.  Wright's statement with additions for context, is in pertinent part set forth below:

> **Appeal:** This investigation was properly conducted according to the procedures of the Office of Conduct, Accountability, and Professionalism (OCAP) and, therefore, Reporting Party was not entitled to an evidence review [i.e, due process]. Reporting Party, for the first time in her appeal, alleges that Respondent retaliated against Reporting Party, not for [protected activing under Title IX by allegedly] violating chain of command with respect to intake of a [harassment] complaint made regarding Respondent's purported boyfriend, but because Reporting Party engaged in protected activity under Title VII/FEHA by making a complaint regarding protected-class misconduct [outside of her chain command]. The Office of Professionalism and Ethics, of which OCAP is a division, routinely intakes complaints that may call for investigation by other fact-finding offices, including OED. It is not uncommon for reporting parties to present to OED or OCAP concerns that might appropriately be handled by the other division. Reporting Party learned of the complaint regarding Respondent's purported boyfriend in the course of her work investigating an OCAP matter. Reporting Party was performing her customary job duties when she took action to refer this matter to the appropriate division within the office (which the investigator found was reasonable for Reporting Party to have done). She was not acting as a reporting party.

79. Even more remarkably, § II of Wright's affirmance openly acknowledged that Plaintiff had reported misconduct, *i.e.*, Plaintiff had raised a complaint relating to Title IX investigations.  Notwithstanding, Wright affirmed the University's use of an inadequate procedure-less investigation into Plaintiff's

Complaint regarding protected class activity in violation of Title IX and USC Title IX policy.

80. Defendants subjected Plaintiff to retaliatory adverse employment actions substantially motivated by, or based on, Plaintiff's protected conduct in seeking compliance with the University's written Title IX procedures.

81. Plaintiff was harmed by Defendant's retaliation.

82. Defendant's conduct was malicious, oppressive or in reckless disregard of the Plaintiff's rights, warranting an award of punitive damages.

## **FOURTH CAUSE OF ACTION**

## **NEGLIGENT SUPERVISION & NEGLIGENT HIRING OR RETENTION**

### **By Plaintiff DOE, individually, against all Defendants**

83. Plaintiff incorporates ¶ 1 through the current as though fully set forth herein.

84. On January 29, 2018, the United States Department of Education, Office of Civil Rights ("OCR"), and Defendant USC, entered into a Resolution Agreement in which Defendant USC agreed to "resolve the violations and compliance concerns identified by [OCR]" relating to Defendant USC's compliance with Title IX of the Civil Rights Act.

85. Nonparty Todd Dickey executed the agreement on behalf of Defendant USC.

86. Pursuant to the resolution agreement, USC agreed that:

> The University will review and revise, as needed, its current Title IX policies and procedures governing the University's response to complaints of sexual harassment, including sexual violence, against faculty and (non-faculty) staff to ensure that they meet the requirements of Title IX and its implementing regulations.

87. Pursuant to the resolution agreement, USC agreed that "that the University will take steps to prevent recurrence of any harassment and to correct its

discriminatory effects on the complainant **and others**, if a violation is found."

88.     Pursuant to the resolution agreement, USC agreed that "the University will implement internal written protocols that . . . provide a process for how either party may raise any concerns about potential conflicts of interest or bias in the appeal process."

89.     Pursuant to the resolution agreement, USC agreed that "provide a process for coordinating and documenting steps taken to prevent recurrence of harassment, if any, and to correct its discriminatory effects on the complainant **and others**, as appropriate."

90.     Pursuant to the resolution agreement, USC agreed that "The University has represented to OCR that it continues to provide mandatory annual training to all individuals involved in investigating and resolving reports or complaints of sexual harassment and sexual violence, including training of individuals who handle appeals."

91.     On June 30, 2018, nonparty Todd Dickey retired.  On information and belief, nonparty Wright was given an interim appointment to Todd Dickey's position as Senior Vice President of Administration.

92.     Due to USC's Resolution Agreement with the OCR, as well as due to other facts, USC entered into a special relationship with those in the Title IX process, imposing on Defendant a duty not to act negligently in the supervision and/or retention and/or hiring of OED officers, employees, and assistants.

93.     Defendant USC approved the retention of Gretchen Dahlinger-Means.

94.     On information and belief, Defendant USC knew that Dahlinger-Means was unfit or incompetent to perform the work for which she was hired because, amongst other matters, Dahlinger-Means failed to adequately disclose or manage her relationship with the director of CWFL, thereby potentially invalidating, for such reason alone, all investigations relating to employees in therapy at CWFL; and because Plaintiff reported that Dahlinger-Means was not complying with Title IX policy; and because Plaintiff reported that Dahlinger-Means was retaliating against

Plaintiff due to Plaintiff's opposition to those violations.

95.    On information and belief, Defendant USC knew that Dahlinger-Means was unfit or incompetent to perform the work for which she was hired because, amongst other matters, Dahlinger-Means's investigations were repeatedly overturned by the Superior Courts and/or Courts of Appeal, and/or internally by the Academic Senate, for reasons that often included denying legally mandated due process.

96.    Defendant USC knew and/or should have known that Dahlinger-Means was unfit and/or incompetent and that such unfitness and/or incompetence created a particular risk to others, including Plaintiff

97.    Plaintiff was harmed because of Dahlinger-Means's unfitness and/or incompetence.

98.    The negligence of Defendant USC and all of them, were a substantial factor in causing Plaintiff's harms.

**FIFTH CAUSE OF ACTION**

**Rescission of Arbitration Contract and/or Voiding Arbitration Contract**
**Cal. Civ. Code § 1698; Cal. Civ. Code § 1670.5; 9 U.S.C. § 4**
**By Plaintiff DOE, individually, against all Defendants**

99.    Plaintiff incorporates ¶ 1 through the current as though fully set forth herein.

100.   Plaintiff, in the course of her employment at USC, has discovered, facts including but not limited to, the following: (1) USC engages in a *systemic* program of spoliation regarding employment files and workplace investigation files, as well as electronic employee records; (2) USC engages in *systemic* spoliation even after USC is served with Preservation Notices; (3) USC intentionally conceals documents that it is required by law to produce; (4) USC maintains "shadow" "personnel records" that it does **not** produce pursuant to section 1198.5 of the *California Labor Code*; (5) USC uses corrupt practices in workplace investigations, such as promoting,

and/or coercing, predetermined findings; (6) USC uses corrupt practices in workplace investigations, such as misclassifying intakes so as to preclude the Responding Party from procedural protections; (7) USC uses corrupt practices in workplace investigations, such as creating one-sided "dirt files" that violate University policy.

101.   In light of the facts alleged herein regarding, amongst other matters, USC's systemic conduct in spoliating employee records and files; USC's admitted, as well as nonadmitted, policies of concealing documents that USC is legally obligated to produce; and in light of USC's deliberate disregard of its own workplace investigation policies; and in light of the OCR's determinations that the Executive Director of Title IX, OED and OCAP lacked credibility it is <u>ludicrous</u> to suppose that arbitration, or any other process that offers "something less than the full panoply of discovery," *Armendariz v. Foundation Health Psychcare*, 99 Cal.Rptr.2d 745, 761 (2000), suffices to vindicate any USC's employee's statutory claims.

102.   Plaintiff also alleges that, in light of USC's unlawful practices, his/her arbitration agreement has its object, "directly or indirectly, to exempt [USC from its] own fraud . . . or violation of law, whether willful or negligent," *Cal. Civ. Code* § 1668, and that, for such purpose, Plaintiff's arbitration agreement with USC is null and void.  USC's policies and practices, including arbitration, exempt USC from its own fraud, and violations of law, through, amongst other matters, abridging and interfering with discovery.

103.   Plaintiff also alleges that, in light of USC's unlawful practices, its arbitration agreement is both procedurally as well as substantively unconscionable. *Cal. Civ. Code* § 1670.5.

104.   Plaintiff's arbitration agreement was imposed as a condition of her employment, and, for such reason, the arbitration agreement was unconscionable as well. *Cal. Civ. Code* § 1670.5.

105.   Plaintiff alleges her arbitration agreement imposed as a condition of

1   employment is void, because, amongst other reasons, the object of the agreement was

2   completely or partially unlawful.  *Cal. Civil Code* §§ 1441, 1598.

3       106.   Plaintiff alleges her arbitration agreement imposed as a condition of

4   employment lacks contractual effect because consent must be free and mutual.  *Cal.*

5   *Civil Code* § 1565.  Plaintiff also alleges a condition involving forfeiture must be

6   strictly construed.  *Cal. Civil Code* § 1442.

7       107.   Plaintiff's arbitration agreement imposed as a condition of employment

8   is also void and/or voidable under federal law.

9       108.   USC  is  a  government  contractor  subject  to  the  Defendant

10  Appropriations Act of 2010.  The Franken Amendment to Defense Appropriations

11  Act for Fiscal Year 2010, bars defense contractors from mandating as a condition of

12  employment arbitration any claim *under* Title VII, or any tort related to or arising

13  from sexual assault or harassment.  Civil Rights Act of 1964, § 701 *et seq*., 42

14  U.S.C.A. § 2000e *et seq*.; 48 C.F.R. §§ 222.7402(a)(1)(i); *id.*, § 252.217-7006;

15  Defense Appropriations Act for Fiscal Year 2010, § 8116.

16      109.   Section 8116 of the Defense Appropriations Act for Fiscal Year 2010

17  does *not* borrow the term "action" or "proceeding" appearing in 42 U.S.C. § 2000-

18  e(1); and which terms appear throughout Title VII.

19      110.   Rather, section 8116 extends to "any claim under title VII."

20      111.   Contrary to the mandate of section 8116, Defendant USC's arbitration

21  agreement provides that it only excludes from arbitration "claims ***brought** under* Title

22  VII."

23      112.   Defendant USC's limited exclusion for claims "***brought** under* title VII"

24  violates the mandate of section 8116.  Yet, discrimination claims prosecuted under

25  state discrimination law are "claims under title VII," as they are authorized by Title

26  VII and form part of Title VII's administrative scheme.

27      113.   For instance, 42 U.S.C. § 2007e-7, provides:   "Nothing in this

28

subchapter shall be deemed to exempt or relieve any person from liability, duty, penalty or punishment provided by any present or future law of any State . . . other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter." *See also*, 42 U.S.C. § 2000e-7 (authorizing worksharing agreements between the EEOC and state agencies like California's DFEH); 42 U.S.C. § 2000e-8(b) (providing for executive-branch coordination with state agencies for furthering equal opportunity); 42 U.S.C. § 2000e-5(c),(d) (EEOC defers to state agencies in parallel enforcement actions).

114.   The statutory scheme of Title VII amply demonstrates that claims arising under state laws that prohibit discrimination against, and/or prohibit harassment of, protected classes, qualify as claims "under" Title VII.  This is because Title VII is intended to function in conjunction with state government and local agency Fair Employment Practices Agencies ("FEPAs").

115.   Defendant USC's arbitration agreement is, accordingly, voidable and/or void and/or subject to reformation and/or subject to rescission to the extent the agreement attempts compelling the arbitration of all claims under the California Fair Employment and Housing Act, *Cal. Gvm't Code* § 12940 *et seq.*  Such claims are claims "under" title VII, and, for such reason, are exempted from arbitration due to Defendant USC's status as a contractor subject to the requirements of the Defense Appropriations Act for Fiscal Year 2010.

116. Consistent with Title VII; and consistent with the Defense Reconciliation Act; and pursuant to California's police powers and regulation of employment contracts, California has enacted sections 432.4, 432.5, 432.6, 923, and 925 of the *California Labor Code* as well as section 12953 of the *California Government Code*.

117.   USC is a California University that is regulated by the State of California.

COMPLAINT — JURY TRIAL DEMANDED

118. Under California's statutory provisions, any "individual unorganized workers" lacking "full freedom of association" to negotiate "the terms and conditions of employment" are subject to state protection against unfair and adhesive contract terms.

119. With respect to adhesive arbitration terms, section 12953 renders it unlawful for *any* employer to impose as a condition of employment an arbitration agreement waiving procedural rights arising under state law for seeking redress against practices that are unlawful under the FEHA and the *Labor Code*.

120. As to Defendant USC, sections 432.5 and 432.6 of the *Labor Code*, and section 12953 of the *Government* Code, simply create a state-law counterpart to Defendant USC's otherwise existing duties under the federal Franken Amendments.

121. Labor Code section 432.6 further provides for attorneys' fees for a plaintiff that prevails in defeating an employer's attempt to limit, pre-dispute, an employee's procedural rights and/or or other rights to enforce FEHA's provisions.

122. Plaintiff is an at-will employee whose contract is extended on each day of employment.

123. In addition to the invalidity of Defendant USC's arbitration agreement due to federal arbitration law and state arbitration law, Defendant USC's arbitration agreement is further void and/or subject to rescission and/or subject to reformation and/or enjoinable due to "such grounds as exist at law or in equity for the revocation of any contract."

124. Plaintiff's arbitration agreement with Defendant is subject to rescission under one or more subdivisions of (b)(1) through (b)(7) of section 1689 of the *California Civil Code*, and, for such reason, Plaintiff rescinds the arbitration agreement. *See Cal. Civ. Code* §§ 1689, 1567, 1568, 1572, 1709 and 1710.

125. Defendant, in its in its Code of Ethics, makes the knowingly false, or otherwise deceitful, representations that: (1) "the University discharges its

1  "obligations to others in a fair and honest manner, and a commitment to respecting
2  the rights and dignity of all persons"; (2) that "when we make promises as an
3  institution, or as individuals who are authorized to speak. . . we keep those promises,
4  including those promises expressed and implied in our Role and Mission statement";
5  (3) that "we promptly and openly identify conflicts of interest"; (4) that "we nurture
6  and an environment of mutual respect and tolerance"; (5) that the University does not
7  ""harass, mistreat, belittle, harm or take advantage of anyone"; (6) that the University
8  does not tolerate "lying" or "deliberate misrepresentation"; (7) that the University not
9  only follows "legal requirements" but further takes into account "ethical
10 considerations"; (8) that the University and all have a "familial and fiduciary duty to
11 one another" because of the "special bonds that bind us together"; and that (9) the
12 University "respect[s] the rights and dignities of others," and "strives for fairness and
13 honesty in dealing with others."

14     126.  Defendant has made, and continues to make, representations that it
15 conducts itself as an ethical and reputable institution of higher learning.

16     127.  Defendant represents itself as an ethical and reputable institution of
17 higher learning for, amongst other reasons, the purpose of recruiting and attracting
18 talented and capable recruits to study with and work for Defendant.

19     128.  But for Defendant's representation of itself as an ethical and reputable
20 institution of higher learning, Plaintiff would not have sought to work for Defendant.

21     129.  But for Defendant's representations regarding its supposed Code of
22 Ethics, Defendant would not have garnered a reputation as an ethical and reputable
23 institution of higher learning and and/or as a reputable employer.

24     130.  Had Defendant's practices and policies been accurately represented to
25 the public, and to current and prospective employees, Defendant would not have
26 garnered a reputation as an ethical and reputable institution of higher learning and
27 employment

28

131.   For such reasons, amongst others, Plaintiff seeks to rescind and/or avoid and/or enjoin enforcement of Defendant's unlawful and unconscionable arbitration agreement of adhesion.

## USC Engages in a *Systemic* Program of Spoliation Regarding Employment Files and Records, and of Workplace Investigation Files

132.   Defendant, in its in its Staff Disciplinary Practices, warrants that "categories and specific behaviors and actions that may result in discipline and/or termination include: "Dishonesty—providing false, fraudulent or inaccurate information in the course of conducting business, on university documents or during university investigations, audits or complaint processes."

133.   Defendant, in its in its Staff Disciplinary Practices, warrants that it makes written records of disciplinary actions.  Defendant posts such information to its website.

134.   Due to, amongst other reasons, the unlawful practices described in this Complaint, Defendant reasonably knew or should have known that such representations were false and untrue; and/or Defendant made such representations despite having no reasonable grounds for believing that such representations were true.

135.   Defendant engages in a systemic program of spoliation, including, but not limited to, the destruction, deletion, and alteration of, employment files, workplace-investigation files, and electronic employment records

136.   For instance, Defendant maintains a policy of only allowing investigators to create a single copy of a Report of Investigation and requiring investigators to constantly write over their prior work, instead of retaining prior drafts.

137.   Defendant's workplace investigators are instructed **not** to save versions

1  of draft documents, separately, thereby spoliating all drafts.

2      138.  Defendant spoliates documents *because* they are anticipated to relate to

3  litigation and/or other proceedings.  Plaintiff was personally informed that the *reason*

4  for the spoliation policy was, amongst other reasons, to ensure that drafts would not

5  be extant in the event that an investigation proceeded to litigation.

6      139.  Plaintiff, as an investigator, was assigned an investigation regarding a

7  USC employee.

8      140.  Plaintiff observed that her drafts of her investigative reports were being

9  deleted without trace by others at the University.  Plaintiff logically deduces that her

10  supervisor was deleting documents.

11      141.  For instance, an investigation authored by Plaintiff was edited on March

12  11, 2019, by Plaintiff's supervisor, Gretchen Dahlinger–Means.

13      142.  Gretchen Dahlinger–Means, at that time, created a new copy of the

14  edited file.

15      143.  Thereafter, Gretchen Dahlinger–Means reedited and overwrote the file

16  on March 18, 2019.  At about the same time, the original version of the report

17  disappeared from Defendant's servers.

18      144.  The file, and other files, were overwritten in a manner deliberately

19  intended to scrub its metadata and obliterate any records of the changes and editing

20  history.

21      145.  Gretchen Dahlinger–Means, despite not being the investigator, first

22  edited, then overwrote Plaintiff's investigative report.

23      146.  Significantly, at the time that such spoliation was occurring, the

24  University knew that an adverse finding was being made against such employee. In

25  short, Dahlinger–Means appeared to be spoliating evidence relating to an anticipated

26  legal dispute.

27      147.  This type of evidence spoliation was contrary and antithetical, in part, to

28

the "collegial process" warranted in Defendant's arbitration agreement with its employees, which collegial process was, and is, represented as an apparent inducement to arbitration.

148.   Plaintiff also witnessed, and documented, spoliation relating to other investigative reports she was uploading to Defendant's servers.

149.   Plaintiff also discovered that *Plaintiff's Tyndall*-related preservation file had been deleted from the shared drive.

150.   Plaintiff, after discovering the spoliation, contacted Anthony Stealey from Defendant's IT department to ascertain whether the documents had audit reports.

151.   Anthony Stealey confirmed that the University's servers *generally* utilized audit reports.  Such audit trails were consistent with USC's federal and state obligations to maintain accurate and not falsified records.

152.   Defendant's IT department, however, further confirmed that the servers for OCAP and OED—Defendant's internal offices for investigating workplace investigations—lacked auditing services.

153.   Defendant's IT department advised Plaintiff, "We don't have any auditing services installed on the [OED/OCAP] server.  Anyone that *has access* to that location can modify it.  Only the user that *creates* the file can delete it."  Thus, a supervisor with an employee's password, or other access, could delete a file.

154.   In other words, Defendant's servers for workplace investigations *differed* from its general IT protocols in that the workplace investigation servers, specifically, did not have audit reports.

155.   Defendant's IT department represented that they would look into the issue and fix it, but Plaintiff is unaware whether this occurred and whether audit trails were subsequently instituted.

156.   Similarly, the University utilizes "i-sight" as case management software.

1  i-sight provides best-practices trainings and seminars, covering the basics of
2  preserving case documentation.  Plaintiff is aware that Defendant did not utilize or
3  adopt the practices recommended by the software provider it used.

4      157.  Defendant further spoliated emails.

5      158.  Plaintiff began backing up her emails after discovering that emails were
6  mysteriously and unexplainedly moving from her inbox to the email trash folder.
7  Plaintiff believes that a superior with access to her emails was spoliating her emails.

8      159.  The email deletions disproportionately appeared to be emails between
9  Plaintiff and John Jividen, who became one of Plaintiff's supervisors.  A substantial
10  portion of the deleted e-mails related to investigations that Plaintiff had conducted,
11  including investigations from which Plaintiff was removed and the investigation
12  passed to another to complete the Report of Investigation.

13      160.  Defendant also, in its ongoing campaign of retaliation and intimidation
14  against Plaintiff, destroyed or deleted substantially all records of Plaintiff's extensive
15  training certificates that Plaintiff had obtained through Defendant's "TrojanLearn"
16  training platform.

17      161.  In the time period when Defendant was engaged in a concerted
18  campaign of retaliation against Plaintiff, for, amongst other reasons, Plaintiff's
19  protected conduct in opposing Title IX violations, Defendant deleted Defendant's
20  "TrojanLearn" training certificates and records.  The deletions also appearlogically
21  related to attempts to retaliate and discredit Plaintiff.

22      162.  For instance, Plaintiff has collected records demonstrating that she
23  completed courses: "Code of Conduct Awareness"; "Conflicts of Interest in
24  Research"; "CA Dept. of Fair Employment Overview"; "Harassment Prevention";
25  "Bullying in the Workplace"; "Prohibited Workplace Conduct"; "Gender Identity
26  and Expression"; "USC Management Essentials"; and others.  All records of such
27  training have disappeared from Defendant's "TrojanLearn" account.

28

163.   Plaintiff is informed and believes that Defendant violated its consent agreement with OCR when Plaintiff was assigned to Title IX investigations without prior University Title IX training being provided by Defendant prior to the execution of those duties.  The convenient disappearance of Plaintiff's training records makes it conveniently impossible to prove whether Defendant did, or did not, provide Plaintiff with the legally mandated training that Defendant was obligated to provide.

164.   Plaintiff has contacted the Defendant on numerous occasions regarding Plaintiff's disappeared trainings.  Despite Plaintiff's numerous requests, the records of training have not been restored.

165.   The numerous communications, and the collective silence of Defendant's various agents, can only reasonably explained as predicated on deliberate instructions for higher ups not to respond to Plaintiff's requests regarding spoliation.

166.   These facts, amongst others, demonstrate that spoliation is a widespread issue at the University.  Particularly the fact that the OED and OCAP servers were set up with different auditing policies than other University departments demonstrates either recklessness, deliberateness or intentional spoliation policies.

## USC Engages in *Systemic* Spoliation even after USC is Served with Preservation Notices

167.   In 2019, Plaintiff obtained Counsel to represent her with respect to, amongst other matters, ongoing disability-discrimination by Defendant.

168.   In 2019, Plaintiff provided Defendant with a notice of a Right to Sue Plaintiff had obtained from the California Department of Fair Employment and Housing against Defendant.

169.   In 2020, Plaintiff's Counsel sent a formal preservation notice to Defendant.  The preservation notice clearly designated a litigation hold for documents relating to Plaintiff's disability and requests for disability accommodation.

170.  In 2020, Plaintiff submitted formal paperwork to Defendant concerning Plaintiff's return to work, pursuant to USC policy, from short-term disability.

171.  The documents were processed in Defendant's personnel-management system, Workday.

172.  Plaintiff, as a trained investigator, and familiar with the University's records practices, and Plaintiff, by force of habit, retained evidence of the documents being processed and approved.

173.  Shortly thereafter, Plaintiff's approval was rescinded.  The rescission of the approval would have constituted further evidence of disability retaliation.

174.  Thereafter, Plaintiff saw that the: (1) processing notifications; (2) initial approval; (3) and subsequent rescission, had all been **deleted** from Workday.  The transactions were scrubbed as if they had never occurred.  There was no audit trail.

175.  Plaintiff documented all such transactions with pictures and other evidence.

176.  Plaintiff, accordingly, is possessed of evidence showing that Defendant's spoliation policies extend to actively destroying pertinent evidence relating to open litigation matters, despite receiving prior preservation letters requesting a litigation hold.

**USC Intentionally Conceals Documents That it is Required by Law to Produce**

177.  Defendant is a federal contractor subject to the duties imposed by the Rehabilitation Act of 1973, including, without limitation, the duty to adopt and implement an Affirmative Action Policy.  *See* https://businessservices.usc.edu/files/2014/06/affirmative_action_notice_2016.pdf

178.  Defendant notifies its Business Associates that "[o]ur affirmative action efforts related to protected veterans and individuals with disabilities are set out and described in our *Affirmative Action Plan* for protected veterans and individuals with

1   disabilities, which is available on request."

2       179.  Defendant's website informs faculty, staff, and students that its

3   "Affirmative Action Plan for Veterans and Individuals with Disabilities is available

4   for inspection in the Office of Equity and Diversity by any student, employee or

5   applicant upon request, during normal business hours."

6       180.  Plaintiff, in 2020, made numerous requests for a copy of Defendant's

7   Affirmative Action Plan.   Due to the COVID-19 restrictions, it was physically

8   impossible to view the Affirmative Action Plan in person.  Federal law requires such

9   Plans to be disseminated.

10      181.  Defendant, through Christine Street, the Associate Vice Provost,

11  Institutional Accessibility and ADA Compliance, advised Plaintiff that she did not

12  have a copy of the University's Affirmative Action Plan, even though Street was

13  responsible for USC strategic planning efforts for ADA/504 compliance.

14      182.  Plaintiff alleges Street's failure to immediately produce USC

15  Affirmative Action plan deprived and continues to deprive Plaintiff and others of

16  rights.  Street initially advised "Plaintiff," in noncredible statements, that USC was

17  searching for its Affirmative Action Plan.  Street then ceased responding to questions

18  about the Affirmative Action Plan.  When Plaintiff did not stop asking, Defendant

19  sent Plaintiff, after a weeks'-long delay, a document titled "Equal Opportunity

20  Policy"; which document was not an affirmative action plan as would ordinarily be

21  mandated for federal government contractors.

22      183.  Based on conversations Plaintiff has had with other employees familiar

23  with the Affirmative Action Plan, Plaintiff is informed and understands that the

24  "Equal Opportunity Policy" provided by the University, in response to Plaintiff's

25  numerous requests, specifically is *not* the University's Affirmative Action Plan.

26      184.  Plaintiff is informed and understands that Defendant is concealing and

27  withholding its Affirmative Action Plan while passing off other documents as its

28

1  supposed Affirmative Action Plan; or in the alternative, Defendant does not have an

2  Affirmative Action Plan for the year of, and years after, 2018.

3       185.   Defendant, as a federal contractor, is required to comply with 41 C.F.R.

4  § § 60-741.41, which provides that, "[t]he full affirmative action program, absent the

5  data metrics required by § 60-741.44(k), shall be available to any employee or

6  applicant for employment for inspection upon request. The location and hours during

7  which the program may be obtained shall be posted at each establishment."

8       186.   Plaintiff, accordingly, is informed and believes that Defendant

9  withholds relevant evidence Defendant is required to furnish under federal law.

10  Plaintiff contends that such issues are a systemic issue at Defendant USC.

11       187.   Similarly, the February 27, 2020, Findings Letter by the U.S. DOE OCR

12  Regional Director, Anamaria Loya, to the University similarly identified the

13  University's noncompliance with document requests from the OCR:

14      OCR notes that the University did not provide all of the documents

15      requested by OCR in this directed investigation. 8To date, the
    University has identified to OCR that it has withheld in their entirety

16      3,638 identified emails and other documents related to its investigation

17      and handling of Employee 1's matter, asserting they are privileged
    attorney client communications and/or attorney work products. OCR

18      requested that, for every document with sections redacted or withheld

19      entirely, the University provide a privilege log identifying the author(s)
    and their position(s), the date(s) it was generated, and the specific

20      privilege or protection invoked and grounds for the privilege/protection

21      for each section of the document. OCR also requested that for
    documents that were redacted, the University provide the full document

22      with the privileged portion redacted and the privilege assertion

23      reflected in the privilege log. As of February 27, 2020, the University
    has not provided a privilege log for all of the redactions. In addition,

24      the University did not follow through with its original offer that the law

25      firm conducting an independent investigation of Employee 1's matter
    would provide to OCR the documents gathered and reviewed by the

26      law firm and its findings in its investigation.

27       188.   As alleged herein, Plaintiff is aware that her *Tyndall* preservation file on

28

-30-

COMPLAINT — JURY TRIAL DEMANDED

1   the OCAP shared drive was deleted under unexplained circumstances.   Plaintiff

2   interviewed *numerous* witnesses with respect to the *Tyndall* matter.

3

4   **USC Maintains "Shadow" Personnel Files that it does *Not* Preserve in its**

5   **Personnel Files Under section 1198.5 of the *California Labor Code***

6       189.   Plaintiff, in February 2019, requested copies of her personnel records.

7   Plaintiff specifically requested copies of any "shadow files" maintained by

8   Defendant.   The existence of "shadow files" was known to investigators but was

9   concealed from or not disclosed to other USC employees and faculty.

10      190.   Defendant produced, pursuant to section 1198.5 of the Labor Code, a

11  personnel file demonstrating that Defendant maintains *extremely detailed* "shadow

12  files."   The contents of the shadow files produce to Plaintiff are categorically

13  personnel files "relat[ed] to the employee's performance."

14      191.   Thereafter, Defendant changed its personnel file policies.

15      192.   Defendant's newly instituted personnel file policies are unlawful on

16  their face.  Under section 1198.5 of the *California Labor* Code, numerous classes of

17  documents must be classified as part of an employee's personnel documents.  USC,

18  however, has adopted an unlawful policy that creates numerous exceptions that

19  directly contravene the legal requirements of *Labor Code* section 1198.5

20      193. For     instance,     Defendant's     personnel     file     policies,

21  https://policy.usc.edu/personnel-files/, exclude "Investigation notes generated from

22  informal complaint investigations," "Manager's working files and notes," "Marginal

23  notes on documents that reflect opinions or judgments that are not supported by fact

24  or documentation."

25      194.   The shadow file produced by Defendant to Plaintiff, prior to this change

26  in policy, unambiguously demonstrates that "Investigation notes generated from

27  informal complaint investigations," "Manager's working files and notes," "Marginal

28

1  notes on documents that reflect opinions or judgments that are not supported by fact

2  or documentation," are, in fact, documents *specifically* "relat[ed] to the employee's

3  performance," within the meaning of section 1198.5 of the *Labor Code*.

4      195.  For instance, the "Manager's working files and notes" collected on

5  Plaintiff was a "dirt file" intended to portray Plaintiff as a problem employee in

6  support of Dahlinger-Means's attempts to threaten, intimidate or coerce Plaintiff.

7  Collegial disclosure of such documents would be necessary to any collegial resolving

8  of differences.  Suppressing such documents violates California law.

9      196.  The shadow file produced by Defendant to Plaintiff further demonstrates

10  that "[m]arginal notes on documents that reflect opinions or judgments that are not

11  supported by fact or documentation," are generally managerial criticisms collected

12  for purposes of support later disciplinary actions.  Suppressing said documents also

13  violates California law.

14      197.  Many of the "[m]arginal notes on documents that reflect opinions or

15  judgments that are not supported by fact or documentation" provide key evidence

16  regarding Defendant's overt, intentional, and deliberate motive to unlawfully retaliate

17  against Plaintiff.

18      198.  In summary, Defendant's new personnel-file production policies,

19  adopted in February 2019, appear *calculated* to withhold documents the University

20  is legally required to produce, and to deprive employees of due process.

21

22      **USC Has a Pattern and Practice of Promoting Predetermined Findings**

23      199.  Plaintiff is also further aware that Defendant's investigatory

24  departments, OCAP, and, to some extent, OED, have a culture of promoting

25  predetermined outcomes regarding workplace investigations.  Multiple courts have

26  reversed investigations conducted under Dahlinger-Means's directorship due to

27  expressed bias and/or denials of due process.

28

200.   For instance, Plaintiff was personally told by Gretchen-Dahlinger Means that, in a certain Title IX sexual harassment/assault investigation, there would be a finding against the Respondent "over her dead body."

201.   Plaintiff also observed how that Title IX investigation was conducted in a manner that tilted in favor of the Respondent.

202.   Further, as alleged earlier, two individuals who Plaintiff is quite certain violated University policy remained with the University and/or were promoted after Plaintiff was removed from the investigation into their contended misconduct.  Upon information and belief, the complaining party was terminated, as planned, based on a pre-determination.

203.   Plaintiff is further aware of how intakes would be referred by high-ranking school officers together with the referring party's not-so-subtle opinion that the complaint was meritless.

204.   Indeed, Plaintiff investigated an intake in which the referring officer indicated that the complaint was meritless.  Plaintiff investigated an issue of a Conflict of Interest at the USC Schaeffer for Health Policy and Economics.  Plaintiff found that there *was* a conflict of interest issue that appeared to require administrative attention.

205.   Thereafter, Plaintiff, when obtaining the shadow file, discovered that he/she had been retaliated against for raising the issue, —even though Plaintiff's doing so was plainly part of Plaintiff's employment duties.

206.   Thereafter, the same issue identified by Plaintiff was identified by a different investigative body within USC with significantly greater independence from administration than OCAP.  Plaintiff is informed and believes that concrete action was taken by that different investigative body.

207.   Plaintiff also witnessed conversations in which Gretchen-Dahlinger Means made statements encouraging investigators to reach pre-determined findings

1  against a tenured faculty member.

2      208.  Plaintiff is familiar with the systemic cultural biases that appear
3  ingrained in USC's workplace, and Plaintiff is aware that it is practically impossible
4  to reasonably litigate one's statutory right in arbitration, for example, without being
5  afforded "the full panoply of discovery," *Armendariz*, 99 Cal.Rptr.2d at 761.

6

7  **USC has a Pattern and Practice of Misclassifying Intakes so as to Preclude the**
8  **Responding Party from Procedural Protections**

9      209.  Defendant further has a culture of violating its own policies and
10  procedures to defeat procedural protections for employees.

11      210.  Perhaps one of the most insidious practices utilized by Defendant is
12  using its discretion to classify "intakes" in a self-serving manner calculated to defeat
13  procedural rights of affected employees.

14      211.  For instance, Plaintiff often watched Gretchen Dahlinger–Means
15  discouraging complaining parties from making a formal Title IX complaint, and
16  encouraged instead the use of informal dispute resolution devices that would under
17  Dahlinger–Means directive would allow the University to avoid categorizing the
18  complaint as a "complaint" for purposes of governmental reporting and compliance.
19  This is too was unlawful and would spoliate material statistical evidence.

20      212.  Additionally, at an OCAP-organized retreat, Plaintiff was instructed that
21  even though Defendant represented to the Academic Senate, and the University at
22  large, that OCAP's procedureless investigations were a "catch all" for investigations
23  that did not fit within protected class conduct, in reality, the University's policy was
24  to treat intakes under OCAP as a "policy of first resort."

25      213.  The Provost had also advised the Academic Senate that OCAP's
26  procedures would be the same as those used by OED.  In actuality, OCAP had *no due*
27  *process* procedures.

28

COMPLAINT — JURY TRIAL DEMANDED

214.   Plaintiff similarly experienced this conduct that when she reported retaliation by Gretchen Dahlinger–Means due to Plaintiff opposing violations of Defendant's written Title IX procedures and other protected concerns, Defendant hired an outside investigator.  The outside investigator conducted a procedureless and inadequate investigation into Plaintiff's complaint about retaliation by Dahlinger-Means and others against Plaintiff's protected conduct.

215.   When Plaintiff advised the investigator, Robin Dal Soglio, that Plaintiff sought to have the formal procedures for protected class complaints, Robin Dal Soglio—*an outside investigator*—responded that "hybrid" issues would be investigated under the OCAP (*i.e.* procedureless) framework.

216.   Such practice was also contrary to USC's duties under FEHA to "develop and distribute to its employees a harassment, discrimination and retaliation prevention policy" that complied with all of the requirements of section 11023(b)(1)-(10) of title 2 of the *California Code of Regulations*.

217.   There is no indication that, prior to the investigation, USC determined Robin Dal Soglio to be an "impartial" and qualified investigator.  Further, there is no indication that Dal Soglio was instructed to "conduct a fair, timely, and thorough investigation that provides all parties appropriate due process and reaches reasonable conclusions based on the evidence collected."

218.   Significantly, Robin Dal Soglio was *not* a University employee, yet Dal Soglio was making some *very* significant statements and assertions regarding the very fundamental and core principles of how the University determined whether a complaining party would be deprived adequate procedural protections when a report contained protected class allegations, or retaliation related matters.   It appears probable that Robin Dal Soglio was parroting instructions and advice from Defendant's officers.

219.   Robin Dal Soglio conducted a noncompliant and inequitable

COMPLAINT — JURY TRIAL DEMANDED

1  investigation into Plaintiff's retaliation complaints that afforded Plaintiff inadequate
2  and/or no procedural rights.

3        220.   For example, all material evidence presented to Robin Dal Soglio was
4  presented for rebuttal to Gretchen Dahlinger–Means.  Dahlinger–Means's rebuttal
5  was never disclosed or shown to Plaintiff.  Plaintiff was **not** even re-interviewed after
6  Dahlinger–Means's rebuttal.  Instead, Robin Dal Soglio recomposed Dahlinger–
7  Means's rebuttal into a "Findings" letter, which rubber stamped Dahlinger–Means's
8  self-serving claims that no retaliation had occurred.

9        221.   Pursuant to University policy, Plaintiff appealed that the University had
10  violated its own policy by imposing an opaque and procedure-less "investigation,"
11  without a basic opportunity to respond, even though Plaintiff had engaged, and
12  asserted that she had engaged, in protected activity under Title VII, Title IX, and
13  FEHA.

14        222.   In violation of §§ A(i) and B(i) and C of a federal Department of
15  Education January 2018 Consent Agreement between the University and the Office
16  of Civil Rights, David Wright, the then-Interim Senior Vice President for
17  Administration affirmed the University's opaque and self-serving mechanisms for
18  determining how complaints would be categorized:

19        **Appeal:** This investigation was properly conducted according to the
20        procedures of the Office of Conduct, Accountability, and
        Professionalism (OCAP) and, therefore, Reporting Party was not
21        entitled to an evidence review. Reporting Party, for the first time in her
        appeal, alleges that Respondent retaliated against Reporting Party, not
22        for violating chain of command with respect to intake of a complaint
23        made regarding Respondent's purported boyfriend, but because
        Reporting Party engaged in protected activity under Title VII/FEHA by
24        making a complaint regarding protected-class misconduct. The Office
25        of Professionalism and Ethics, of which OCAP is a division, routinely
        intakes complaints that may call for investigation by other fact-finding
26        offices, including OED. It is not uncommon for reporting parties to
27        present to OED or OCAP concerns that might appropriately be handled
        by the other division. Reporting Party learned of the complaint

regarding Respondent's purported boyfriend in the course of her work investigating an OCAP matter. Reporting Party was performing her customary job duties when she took action to refer this matter to the appropriate division within the office (which the investigator found was reasonable for Reporting Party to have done). She was not acting as a reporting party.

223. Even more remarkably, § II of Wright's affirmance openly acknowledged that Plaintiff had reported misconduct relating to Title IX investigations. Notwithstanding, Wright affirmed the University's use of an inadequate procedure-less investigation into Plaintiff's Complaint regarding protected class activity, in violation of Title IX, and in violation of USC Title IX policy

224. In another incident, Plaintiff personally observed how Dahlinger–Means attempted to unilaterally terminate a complaint regarding violence on campus because the incident had occurred on a weekend. Gretchen Dahlinger-Means told Plaintiff how numerous administrator-members of the Employee Relations Committee had prevailed on her to change her opinion regarding the matter.

225. Dahlinger-Means, however, continued to express bias against investigating the matter, stating that USC had to be careful about pursuing employees for conduct on their own time. This was at the same time as Dahlinger-Means's executive boyfriend had plead guilty to a sex crime charge that had occurred outside work hours.

226. Similarly, the Office of Civil Rights later found that Gretchen Dahlinger-Means had improperly unilaterally dismissed complaints made against George Tyndall without investigating.

227. The California Courts of Appeal have overturned other USC investigations for similar prejudgment and lack of due process.

228. These facts, amongst others, demonstrate that USC is singularly apathetic, or worse, to its legal obligations to provide procedural fairness to

1  employees, and demonstrate that USC violates its own policies and its own
2  representations to the Academic Senate, in order to promote USC's ability to handle
3  employee investigations in the way that suits its biased administrative interests,
4  serving to perpetuate a culture of misconduct and cover-up.

5      229.   USC, which has demonstrated a history of misconduct, cannot be trusted
6  to comply in good faith with private contractual arbitration requirements so as to
7  provide due process.  Sufficient evidence demonstrates that USC will not comply
8  with discovery procedures, which aggrieved employees require to obtain redress of
9  statutory rights.  Absent being afforded "the full panoply of discovery," *Armendariz*,
10 99 Cal.Rptr.2d at 761, and other due process rights available in court, including to
11 determine whether USC's discovery responses are complete and truthful, and what
12 documents it might have been spoliated, it is not possible for an employee to obtain
13 vindication of statutory rights when the playing field is so decisively stacked in the
14 employer's favor.

15

16 **USC Violates its Own Policies to Create "Dirt Files" Against Vocal Faculty**

17     230.   Plaintiff also opposed the University's unlawful, unfair, and fraudulent
18 practice of using the its ironically-named Office of "Accountability" and
19 "Professionalism" as the University's "hit team" for carrying out retaliation against
20 tenured professors that had voiced opinions that were disfavored by the University's
21 administration.

22     231.   Plaintiff, for instance, was instructed to create an adverse investigatory
23 record against Professor Jane Doe, a Professor of Art History and History at USC
24 Dornsife.   Gretchen Dahlinger–Means instructed that Plaintiff's role was
25 documenting *negative* information regarding Professor Doe.  "We can write a letter
26 to her chair/Dean that is anonymized *complaints*."  The negative information gathered
27 in the dirt-digging task was to be submitted to faculty (Professor Jane Doe's dean),

28

1   without providing Doe the ability to respond.

2       232.  Plaintiff is informed and believes that the dirt-digging "investigation"

3   against Professor Doe was due to Doe's vocalizing unpopular opinions.  Doe was

4   perceived as critical of efforts within Dornsife to focus new hires and Dornsife

5   resources towards non-Caucasian art studies.

6       233.  Unsatisfied with the outcome of a prior formal investigation that

7   concluded Professor Doe had *not* violated any University policies and/or that

8   Professor Doe had *not* engaged in wrongdoing, Gretchen Dahlinger–Means

9   instructed Plaintiff to commence a *new* round of dirt-digging interviews, *without*

10   notice to Professor Doe.  Only *adverse* information was to be collected, without

11   notice to Professor Doe, and the collected would be placed in Professor Doe's

12   personnel file.

13       234.  Plaintiff respectfully opposed the University's unlawful, unfair, and

14   fraudulent practices on grounds that such practices violated the Faculty Handbook.

15   The Faculty Handbook prohibited undisclosed investigations.  FH, Ch. 6-D.  The

16   Faculty Handbook prohibited retaliating against academic freedom.  FH, Ch. 3-B(1).

17   The Faculty Handbook prohibited making undisclosed reports.  FH, Ch. 6-F.

18       235.  These facts were ever more significant due to the undisclosed practice

19   of certain high-ranking school officials to run potential promotions past OCAP and/or

20   OED to determine whether there were issues with the relevant candidate.

21   Accordingly, OCAP's dirt files created a basis for potential retaliation against victims

22   without the victims ever knowing that they had lost a promotion opportunity based

23   on an unknown dirt file sitting in OCAP's records.

24       236.  In response to Plaintiff's opposition against violating the Faculty

25   Handbook, Gretchen Dahlinger–Means retaliated against Plaintiff's protected

26   opposition by characterizing Plaintiff as insubordinate; making false harassing

27   statements about Plaintiff to other University personnel; and other adverse

28

1  employment actions.

2     237.  The University unconscionably lays groundwork for turning private

3  arbitration into a vehicle for confirming its sought outcome.  By creating adverse

4  employment records that could be "produced" in arbitration, without adequate

5  opportunity to discover unlawful motives underlying those records, or violations of

6  legal rights, arbitration becomes a rubberstamp for the conclusion cooked into the

7  employee's personnel file.  Employees would never discover the full panoply of

8  USC's evidentiary misconduct.  Further, arbitration is designed to exempt USC from

9  said misconduct.

10

11           **USC Conceals Key Conflict Information that**

12   **Appears to Have Corrupted Numerous Workplace Investigations**

13     238.  Plaintiff, in the course of her employment, handled a workplace sexual

14  harassment complaint regarding John Gaspari, Dahlinger–Means then-boyfriend and

15  future husband.

16     239.  Plaintiff was aware that John Gaspari was romantically involved with

17  Plaintiff's supervisor, Gretchen Dahlinger–Means.

18     240.  Prior to Plaintiff shielding the complaint against Gaspari from

19  Dahlinger–Means's potential interference, Dahlinger–Means and Plaintiff were very

20  friendly and Dahlinger–Means disclosed personal information.

21     241.  John Gaspari and Gretchen Dahlinger–Means have since married, and

22  Gretchen Dahlinger–Means now goes by the name Gretchen Gaspari.

23     242.  Due to the University's policy deeming a conflict of interest to exist

24  where an individual has a "personal interest" in the outcome of a claim against an

25  "intimate friend"; and due to Gretchen Dahlinger–Means's absolute ability to

26  terminate any complaints about her romantic partner, John Gaspari, Plaintiff did not

27  report the complaint regarding John Gaspari to her immediate supervisor.  Plaintiff

28

1   instead engaged in protected activity and reported the complaint to an alternative

2   manager, John Jividen.

3        243.   Jividen reported the matter to General Counsel; thereafter, John Gaspari

4   was terminated.

5        244.   Plaintiff is informed and believes that the University, in investigating

6   John Gaspari, learned that John Gaspari had pled guilty to a sexual-misconduct

7   criminal charge involving nonconsensual sexual photography—conduct uncannily

8   similar to the Tyndall fiasco.

9        245.   Gaspari was discreetly terminated.  On information and belief, USC

10   made no report to any state agency or licensing board.

11        246.   Gretchen  Dahlinger–Means—the  University's  Executive  Director

12   responsible  for  overseeing  investigations   of  workplace  misconduct  and  alleged

13   violations of Title VII, Title IX, and FEHA—then engaged in a concerted campaign

14   of retaliation to label Plaintiff as a problem employee; attacked Plaintiff's character

15   throughout the University; placed Plaintiff on forced administrative leave; denied

16   preapproved time off work; and engaged in other workplace retaliation.

17        247.   At  the  time  of  his  termination,  John  Gaspari  led  the  university's

18   landmark Center for Work and Family Life ("CWFL") providing, expert assistance

19   on issues from emotional wellbeing to crisis intervention.

20        248.   John Gaspari's partner, Gretchen Dahlinger–Means, served, at the very

21   same time, as the Executive Director of the University department responsible for

22   overseeing USC's workplace investigations.

23        249.   Staff and faculty being investigated by OED, Title IX or OCAP would

24   be affirmatively referred to CWFL as a resource for counseling regarding their

25   workplace stress.  OCAP and OED, the Offices under Gretchen Dahlinger–Means's

26   supervision, affirmatively identified CWFL as a resource for employees under

27   investigation.  *See, e.g.,* https://equity.usc.edu/resources/.   OED's *findings letters*

28

1  *against employees* would advise: "Our office recognizes that these are difficult issues
2  . . . . [C]ounseling and support services are available to you through the Center for
3  Work and Family Life (CWFL)."

4      250.   This conflict was never disclosed to USC's faculty or staff.  Staff and
5  faculty being investigated by Gretchen Dahlinger–Means's department would be
6  referred to Gaspari's department for counseling.

7      251.   Staff and faculty would be disclosing their closest secrets without
8  knowing the relationship between their counselor and the office investigating them.
9  The conflict was even more pronounced because Gretchen Dahlinger–Means did not
10  implement any ethical wall to manage the conflict between her and Gaspari, and, as
11  explained herein, Gretchen Dahlinger–Means expected that all complaints about
12  Gaspari's misconduct would be referred to her by her subordinates for determination.
13  Indeed, Dahlinger–Means was livid when she found out that Plaintiff had reported
14  the alleged sexual harassment to Jividen.  Dahlinger–Means even admitted that the
15  conduct was protected when Dahlinger–Means asserted that Plaintiff had gone
16  "outside the chain of command."

17      252.   In essence, USC's confidential mental health resource was in a personal
18  relationship with USC's "prosecutorial office."  If any complaints about the
19  arrangement were to arise, Gretchen Dahlinger-Means expected that those
20  complaints would be referred to herself to determine whether a conflict existed.  Yet,
21  there was no disclosure of the relationship to the USC community.  Employees under
22  investigation would doubtless feel violated to learn their confidential-crisis advisor
23  was in a romantic relationship with the Executive Director of the office investigating
24  them and potentially making career-determinative decisions.

25      253.   Such issues, hidden from the public and only known to individuals
26  within USC's workplace investigation offices, further demonstrate why, *vis a vis*
27  USC, any non-court procedure that fails to afford "the full panoply of discovery,"

28

COMPLAINT — JURY TRIAL DEMANDED

1 | *Armendariz*, 99 Cal.Rptr.2d at 761, is worthless, or otherwise interferes or abridges
2 | USC employee rights

3

4 | **The Public Interest would be Prejudiced by Allowing USC's Arbitration**
5 | **Agreement to Stand**

6 | 254.   In addition to the above allegations, the Arbitration agreement is
7 | unconscionable because the agreement seeks to bake unfairness into the arbitral
8 | process, in a manner that allows USC to exploit the arbitral forum in its favor.
9 | Amongst other matters:

10 | 255.   The Agreement imposes more than notice pleading, at the same time as
11 | hiding or spoliating evidence, requiring the employee's written notice "shall identify
12 | and factually describe the nature of all claims asserted." Thus, the Agreement allows
13 | USC to gauge, at the outset, the extent of the employee's knowledge and the
14 | employee's susceptibility to being taken advantage of in arbitration.

15 | 256.   The Agreement, without disclosing a history of spoliation, indicates the
16 | "arbitrator shall afford the parties adequate discovery" taking into account "their
17 | shared desire to have a fast, cost effective dispute resolution mechanism."

18 | 257.   The Agreement permits a motion to dismiss or summary judgment under
19 | the Federal Rules of Civil Procedure but fails to provide employees the full panoply
20 | of discovery upon which such rules are designed.

21 | 258.   The Agreement purports to waive "any right to bring on behalf of
22 | persons other than the employee, or otherwise participate with other persons in any
23 | class or collective action," whether in court or in arbitration.

24 | 259.   The Agreement appears to impose a class waiver even as to claims that
25 | the Agreement excludes from arbitration. Thus, the waiver is not limited to bi-lateral
26 | arbitration.

27 | 260.   Even though the agreement has one object, arbitration, it provides that
28

1  if the any provision of this "Agreement is determined to be void or otherwise

2  unenforceable, this determination shall not affect the validity of the remainder of the

3  agreement."

4

5      **The Arbitration Agreement Fails to Disclose that the Arbitration is to be**

6                  **Conducted by a Non-Neutral Forum**

7          261.   The arbitration agreement further provides that arbitration is to be

8  determined by JAMS.

9          262.   The arbitration agreement does not disclose that JAMS is a nonneutral

10  forum and that JAMS and USC share a relationship.

11         263.   Unlike the AAA, which is a not-for-profit, JAMS is operated like a law

12  firm, in which one quarter of JAMS arbitrators are shareholders, much akin to

13  partners, or owners, in a law firm.

14         264.   Plaintiff is informed and believes that there is a "partnership track"

15  through which nonpartner arbitrators can "make partner."

16         265.   These issues were recently the basis for vacatur of an arbitration award

17  in *Monster Energy Co. v. City Beverages, LLC*, 940 F.3d 1130 (9th Cir. 2019), where

18  the Ninth Circuit vacated an arbitration award due to the JAMS arbitrator's

19  undisclosed ownership interest in the arbitration company and the arbitration

20  company's substantial business relationship with one of the parties.

21         266.   JAMS's statement regarding "Neutrality" states:

22      JAMS has approximately 400 neutrals on its panel, and a little over one
        quarter of JAMS neutrals have an ownership share in the company.
23      Each owner holds one share and there are no outside shareholders.
        Owners are not privy to information regarding the number of cases or
24      revenue related to cases assigned to other panelists.  No shareholder's
        distribution exceeds .1% of JAMS total revenue in a given year.
25      Shareholders are not informed about the extent to which their profit
        distribution may be impacted by any particular client, lawyer or law
26      firm and shareholders do not earn credit for the creation or retention of
27      customer relationships.
28

-44-
COMPLAINT — JURY TRIAL DEMANDED

267.   The statement that "[o]wners are not privy to information regarding the number of cases or revenue related to cases assigned to other panelists" is unhelpful and noninformative, because the statutory disclosures under section 1281.96 of the *Code of Civil Procedure* allow the arbitrators to determine who their most reliable patrons are.

268.   The statement that "No shareholder's distribution exceeds .1% of JAMS total revenue in a given year" does not say much.  The relevant question is net profits, not revenue.  Further, this statement does not disclose retained earnings, or other benefits provided from revenue.   The statement appears crafted to conceal information from employees.

269.   Precisely as was the issue in *Monster Energy*—which issue warranted *vacatur*—JAMS and USC have some sort of undisclosed relationship.   At a minimum, JAMS is the sole arbitration forum for USC, JAMS arbitrators share in profits from USC arbitrations, and there appears to be some form of other partnership or joint venture with JAMS.  Many JAMS arbitrators are also USC graduates.

270.   JAMS and AAA's section 1281.96 disclosures show that USC apparently, in some time about 2015, switched the dispute-resolution provider in its agreements from AAA to JAMS.

271.   At about the same time, in 2016, JAMS began hosting annual symposiums in *partnership* with USC.  Plaintiff is informed and believes that such partnership monetarily benefits JAMS, its shareholders, and its future shareholder arbitrators.

272.   Significantly, the 2016 symposium, one year after USC switched its arbitration provider, designated the symposium as an "annual" event even though the event was the initial such event.   Indeed, the JAMS–USC symposiums have continued annually.

273.   Significantly, JAMS's latest 1281.96 disclosures show Monster Energy

1  is disclosed as a party in **five** proceedings; USC has been the Respondent in **thirteen**
2  JAMS proceedings in the same time.  Almost, three times the amount.

3      274.  The relationship, and "repeat player" effect, creates an actual or apparent
4  conflict. It is unlikely that a JAMS shareholder, or arbitrator, would antagonize a
5  repeat player like USC, particularly given USC's partnership with JAMS and
6  particularly given USC's designation of JAMS Los Angeles as exclusive forum.   It
7  is unlikely that a JAMS shareholder would antagonize one of Los Angeles County's
8  largest employers, thereby alienating USC to seek ADR Services, Signature
9  Resolution, or another forum.  It is similarly unlikely that a nonshareholder arbitrator
10  seeking to become a future shareholder; or that an arbitrator dependent on his or her
11  JAMS affiliation; would make an award or ruling that could risk antagonizing the
12  USC–JAMS relationship.  This violates due process, and, at a minimum, whether
13  consciously or subconsciously, further tips the scales of private injustice in favor of
14  USC.

15      275.  In 2018, USC revised its arbitration agreement.  USC revised arbitration
16  agreement fails to disclose that, since 2016, USC and JAMS have partnered in
17  symposiums and fails to disclose how JAMS is organized and owned; which are
18  circumstances that could lead a reasonable employee to doubt JAMS's impartiality.

19
20      **Plaintiff is Entitled to Rescission, Reformation, or to Void the Agreement**

21      276.  For the foregoing reasons, Plaintiff seeks to avoid and/or rescind the
22  arbitration agreement with Defendant.

23      277.  Due to the foregoing reasons, Defendant's arbitration agreement is
24  subject to rescission, as it illegal, unconscionable, contrary to public policy,
25  prejudicial to the public interest, void, lacks free consent, and obtained through fraud,
26  deceit and/or mistake of fact.

27      278.  Alternatively, Plaintiff seeks to enjoin enforcement of the arbitration
28

1   agreement as the agreement protects unlawful, unfair and/or fraudulent business acts

2   and/or practices. It should be noted that USC is one of the largest institutional

3   employers in Los Angeles.

4       279.   Alternatively, Plaintiff seeks to reform the arbitration agreement to

5   provide for the full discovery authorized under, and to strike the numerous

6   unconscionable provisions, as provided in *California Code of Civil Procedure*. *Cal.*

7   *Civ. Code* § 3399.

8       280.   Alternatively, Plaintiff is entitled to enjoin Defendant's arbitration

9   agreement under § 17200 of the *California Business & Professions Code*, et seq.

10      281.   Plaintiff alleges that USC willfully deceived Plaintiff concerning the

11  agreement to arbitrate claims by asserting or suggesting facts which were not true

12  and/or that Defendant had no reasonable ground to believe were true.

13      282.   USC, for example, through C. L. Nikias and other managerial agents,

14  represented that there were "internal processes for collegially resolving differences,"

15  and "internal collegial processes."

16      283.   USC has admitted to its Academic Senate that such representations were

17  false.

18      284.   As alleged earlier, USC also suppressed facts which it was obligated to

19  disclose, and instead gave Plaintiff information of other facts which were likely to

20  mislead for want of communication.

21      285.   The problems of limited-discovery arbitrations, as well as other one-

22  sided procedures, applicable to USC based on the facts alleged here, were highlighted

23  at length in Justice Baxter's dissent in *Moore v. Conliffe*, 7 Cal. 4th 634, 637 (1994):

24          1. *Foremost among the features which deter perjury in a judicial*
            *proceeding is the fact that a judicial proceeding is a public proceeding*.
25          The trial is open to the press and public and a record of the proceeding
            is available to the press and the public. Since litigants and witnesses are
26          aware that their statements are subject not only to cross-examination
            and impeachment, but also to *public scrutiny*, the possibility that
27          perjury will be exposed acts as a *deterrent* to perjury.
28

-47-
COMPLAINT — JURY TRIAL DEMANDED

*2. The judge and jury are neutral decision makers. Neither is dependent upon the parties to litigation for income.* This neutrality ensures, to the greatest extent possible, that perjury will be recognized and a just decision rendered.

3. Witnesses are sworn to tell the truth.

4. Discovery is available to the parties. The ability to discover the evidence upon which the opponent's case rests enables the parties to prepare effective cross-examination and to obtain and present impeaching evidence.

5. The trier of fact is required to follow the law, and review for errors of law or insufficiency of credible evidence is *available by appeal*.

*The Legislature has determined that those protections are sufficient to warrant denying a litigant the right to a civil action against a perjurious witness.* It has not done so with regard to arbitration for good reason. *That reason is that comparable protections are not guaranteed in private contractual arbitration.* By contrast:

1. *Arbitration proceedings are private.* None of the formality of a judicial proceeding surrounds an arbitration hearing. *Rules governing judicial procedure are not applicable.* (Code Civ.Proc., § 1282.2, subd. (d).)

2. *The arbitrator, or arbitrators, are dependent upon the parties for their income.* They are not required by law to take an oath of fairness and impartiality. *Institutional litigants whose contracts relegate all disputes to arbitration are the major source of income for many arbitrators.* Many serve repeatedly as arbitrators for institutional clients. (See, e.g., *Kaiser Foundation Hospitals, Inc. v. Superior Court (Coburn)* (1993) 19 Cal.App.4th 513, 23 Cal.Rptr.2d 431; *Neaman v. Kaiser Foundation Hospital* (1992) 9 Cal.App.4th 1170, 11 Cal.Rptr.2d 879; see also, Note, *The Impression of Possible Bias: What a Neutral Arbitrator Must Disclose in California* (1993) 45 Hastings L.J. 113.) Neutral decisionmaking is not, and cannot be, guaranteed under these circumstances. The likelihood that the testimony of a witness who regularly appears on behalf of an institutional client will be perceived as perjurious is necessarily diminished.

COMPLAINT — JURY TRIAL DEMANDED

3. Witnesses need be sworn only on request of a party and the rules of evidence do not apply. (Code Civ.Proc., § 1282.2, subd. (d).)

4. *Discovery is not guaranteed.* Depositions are available only as evidence, not for discovery purposes, except in matters involving personal injury or death, and then only if the arbitrator grants a party's application. (Code Civ.Proc., §§ 1283, 1283.05.) Only in actions involving personal injury or death, or claims of damage in excess of $50,000, may a party demand that the other party provide a list of witnesses prior to the hearing. (Code Civ.Proc., § 1282.2, subd. (a)(2).) Failure to list a witness is not a bar to admission of that witness's testimony. (Code Civ.Proc., § 1282.2, subd. (a)(2)(E).)

*The likelihood that a party will be able to mount an effective cross-examination when the nature of a witness's proposed testimony is not known prior to the hearing is significantly reduced, as is the ability of the party to marshal other evidence to counter that testimony at the hearing.*

5. *No record need be kept.* The content of a witness's testimony is not preserved and thus not open to posthearing scrutiny by third parties. *A witness may therefore give conflicting testimony in separate arbitration proceedings without fear of exposure.*

6. *No appellate or any judicial review is available for insufficiency of credible evidence.* The ruling of the arbitrator is *final* insofar as the factfinding process is involved. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9–11, 10 Cal.Rptr.2d 183, 832 P.2d 899.)

The assertion of the majority that private contractual arbitration is comparable to a judicial proceeding is, in the end, based only on its purpose of adjudicatory dispute resolution. *What is omitted in this reasoning is any mention of the fact that the procedure for a private contractual arbitration hearing is not established by statute, but by the contract between the parties.* The provisions of Code of Civil Procedure sections 1282 and 1282.2, which offer a skeleton procedural format for the conduct of arbitration proceedings, are default procedures. Each section is expressly applicable "[u]nless the arbitration agreement otherwise provides, or unless the parties to the arbitration otherwise provide...." (*Ibid.*)

COMPLAINT — JURY TRIAL DEMANDED

> There is, therefore, no single or even standard format for private contractual arbitration. ***None of the safeguards and procedures available to a party in a judicial proceeding to expose false testimony are guaranteed in private contractual arbitration. Although cross-examination may be assumed to be permitted in all such proceedings, it is not cross-examination by an attorney or party who is informed by discovery of impeaching evidence.***

*Moore v. Conliffe*, 7 Cal. 4th 634, 663–65 (1994).

286.   Such considerations demonstrate that, as applied to USC's arbitration scheme, in light of the corrupt practices detailed herein, Defendant's arbitration agreements can only be viewed as unconscionable and/or procured through fraud and/or procured through an employee's mistake of fact and/or unlawful and contrary to public interest or public policy.

287.   No trier of fact can conclude that the foregoing facts are immaterial to Defendant's employees' agreement to arbitration and Defendant's employees' lack of knowledge regarding the foregoing facts are grounds for avoiding the contracts and/or rescission and/or reformation and/or injunction.

288.   The right to a jury trial enshrined in § 4 of the FAA is of constitutional import.

289.   Any act of Congress seeking to abridge the right to a jury trial; or seeking to limit the right to Petition the government for redress, is unconstitutional.

290.   Similarly, any act of Congress seeking to delegate adjudicatory powers over common law claims to a non-Article III court is unconstitutional and exceeds Congress's lawmaking powers.   *Northern Pipeline Construction Company v. Marathon Pipe Line Company*, 458 U.S. 50 (1982).

291.   The FAA's constitutionality, accordingly, is dependent on the premise that the FAA only enforces voluntary contractual agreements.

292.   The jury right under § 4 is, accordingly, stands as a bulwark against the unconstitutional deprivation of rights that would result if a plaintiff were barred from

petitioning the government for redress, due to a supposed "agreement" that, in fact, lacks contractual force.

293.   The USC arbitration agreement further reserves to a § 4 jury to determine the agreement's enforceability.  The USC arbitration agreement provides that it incorporates the JAMS Employment Procedures; and the JAMS Employment Minimum Standards provide:

> If a party contests the enforceability of a pre-dispute arbitration agreement that was required as a condition of employment, and if compliance with the Minimum Standards is in question, JAMS will, if given notice of the dispute, defer administering the arbitration for a reasonable period of time to allow the contesting party to seek a judicial ruling on the issue. JAMS will comply with that judicial determination. If there is no judicial determination within a reasonable period of time, JAMS will resolve questions of arbitrability under the applicable JAMS Arbitration Rules and Procedures for Employment Disputes.

### SIXTH CAUSE OF ACTION

### RULE 23(b)(2) CLASS ACTION

### Rescission of Arbitration Contract and/or Voiding Arbitration Contract

### Bus. & Prof. §§ 17200 *et seq.*; Cal. Civ. Code §§ 1670.5, 1668

### By Plaintiff DOE, and all others similarly situated, against all Defendants

294.   Plaintiff incorporates ¶ 1 through the current as though fully set forth herein.

295.   Plaintiff brings this action on behalf of Plaintiff and on behalf of all others similarly situated (the "Class").

296.   Pursuant to §§ 17200 *et seq.* of the *California Business & Professions Code*, Plaintiff seeks, on behalf of the Class, to enjoin all staff employee arbitration agreements imposed by Defendant on its employees and/or faculty.  Plaintiff does not seek an injunction concerning any employee who is employed under a Collective Bargaining Agreement.

297.   Pursuant to section 1670.5 of the *California Civil Code*, Plaintiff seeks, on behalf of the Class, to avoid all arbitration agreements imposed by Defendant on its staff employees.

298.   Pursuant to section 1668 of the *California Civil Code*, and similar authority, Plaintiff seeks, on behalf of the Class, to avoid all arbitration agreements imposed by Defendant on its staff employees.

299.   Plaintiff alleges that identification of class members is not essential under Rule 23(b)(2).  In the event of a contrary holding by the Court, Plaintiff shall amend with a Class definition.

300.   Plaintiff does not know the number of members in the Class, but believes the Class members number in the thousands, if not more.  On information and belief, Defendant is the third largest employer in Los Angeles County, employing over 65,000 individuals.  Thus, this matter should be certified as a Class action to assist in the expeditious litigation of this matter.

301.   Plaintiff alleges that the party against whom relief is sought has acted (or refused to act) on grounds generally applicable to a class of persons, thereby making appropriate declaratory or injunctive relief with respect to the class as a whole.  The relief sought is public injunctive relief.

302.   The class members are generally bound together through preexisting or continuing legal relationships, or by some significant common trait, in that the class members are all employed by or have been employed by Defendant, signed a written arbitration agreement ("Agreement to Arbitrate Claims") in conjunction with and as a condition of commencing employment, and were not provided a written statement warranting that the relevant class members would be employed even absent signing such arbitration agreement.

303.   The joinder of the Class members is impractical and the disposition of their claims in the Class action will provide substantial benefits both to the parties

1   and to the court. The Class can be identified through Defendant's records or
2   Defendant's agents' records.

3        304.   There are questions of law and/or fact common to the Class including,
4   but not limited to, that the spoliation practices described herein and evidence
5   suppression practices described herein are against the public interest, and applicable
6   to any employee and/or faculty member and such employees and/or faculty members
7   and the prevalence and pervasiveness of the practices described herein create grounds
8   under California state contract law to avoid and/or enjoin the enforcement of any
9   agreement limiting the Class's ability to discover through compelled process the
10  unlawful and fraudulent practices described herein as applied on any class member
11  or to all class members.

12       305.   There can be no doubt each and every employee arbitration agreement
13  is, due to grounds applicable to all contracts, either (1) contrary to an express
14  provision of law, (2) contrary to the policy of express law, though not expressly
15  prohibited, or (3) otherwise contrary to good morals.   *Cal. Civ. Code* § 1667; *see*
16  *also* USC Code of Ethics.

17       306.   The Claims of Plaintiff are typical of the Class in that Plaintiff, amongst
18  other matters, seeks to obtain discovery regarding various legal claims he/she has
19  made and intends to potentially make against the University, and Plaintiff, and the
20  Class, are hindered or abridged in doing so through being bound by arbitration
21  agreements that all require compliance with the JAMS Employment Arbitration
22  Rules & Procedures, which, amongst other matters, only guarantees a single
23  deposition and that relies on the good faith of the Parties to determine what
24  documents are relevant to the claims of the counterparty. *See* JAMS Rule 17.  Here,
25  the facts demonstrate that, as to the class, USC lacks good faith and that statutory
26  violations cannot be remedied in arbitration.  One need only look at the Dr. Tyndall
27  scandal to see how USC's lack of appropriate morals has harmed the public interest.

28

307.   Plaintiff will fairly and adequately represent and protect the interests of the Class in that Plaintiff has no interests antagonistic to any member of the Class. Plaintiff hereby excludes all management staff employees from the class, and all employees involved in drafting, enforcing, or otherwise administrating the arbitration policies.

308.   Plaintiff has retained counsel experienced in handling employment-law class action claims.

309.   Absent a class action, the Class will continue to face the potential for irreparable harm. In addition, these violations of law will be allowed to proceed without remedy and Defendant will likely continue such illegal conduct.  Major scandals have not changed the corruption at USC.  There is no more complete way to ensure USC's compliance with legal and ethical requirements than a public revocation, a prohibitory injunction, or other remedy for its arbitration scheme.

310.   Because of the knowledge known only to Plaintiff and others working in Defendant's offices for workplace investigations, few, if any, Class members would be equipped or capable of seeking legal redress for the wrongs complained of herein, or to inform and assist counsel, or obtain redress.

311.   Plaintiff and members of the Class were harmed by the acts of Defendant in at least that Plaintiff and the Class have been subjected to arbitration agreements that under state law grounds are unconscionable and/or illegal and/or unlawful and/or fraudulent and/or unconscionable.

312.   Plaintiff reserves the right to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

313.   Plaintiff alleges that manageability considerations are not relevant to the certification of a (b)(2) class.  Notwithstanding, Plaintiff alleges that the issues raised herein are identical, and the answers the same, to all class members and that management of the claims is likely to present significantly fewer difficulties than

those presented in many class claims.

314.   If any of the relief herein cannot be had, Plaintiff requests an injunction that USC provide (1) the Operative Complaint herein to each and every non-management level employee at USC who signed an "Agreement to Arbitrate Claims," (2) to all JAMS offices in the state of California, and (3) each and every JAMS arbitrator sitting on any USC employment case.  Such notice is necessary to ensure that each and every arbitrator and claimant may assert that need for discovery should consider whether USC may have engaged in the unfair, unlawful and fraudulent practices alleges, and whether such should inform each said arbitrator's  affording of discovery to employee Claimants.

## **PRAYER FOR RELIEF**

Plaintiff DOE, individually, and on behalf of all others similarly situated accordingly prays for the following relief against Defendant UNIVERSITY OF SOUTHERN CALIFORNIA, a California nonprofit corporation; and Does 1 through 20, inclusive:

### **On the First and Second Causes of Action**
### **Plaintiff DOE Individually**

(1)    For compensatory damages;

(2)    For all attorneys' fees incurred;

(3)    For all costs of suit;

(4)    For injunctive relief;

(5)    For such other and further relief as the Court deems just and proper.

1

## **On the Third Cause of Action**

2

### **Plaintiff DOE Individually**

3

4    (1)    For compensatory damages;

5    (2)    For special and general damages;

6    (3)    For punitive damages;

7    (4)    For all attorneys' fees incurred;

8    (5)    For all costs of suit;

9    (6)    For injunctive relief;

10   (7)    For such other and further relief as the Court deems just and proper.

11

## **On the Fourth Cause of Action**

12

### **Plaintiff DOE Individually**

13

14

15   (1)    For compensatory damages;

16   (2)    For special and general damages;

17   (3)    For all costs of suit;

18   (4)    For injunctive relief;

19   (5)    For such other and further relief as the Court deems just and proper.

20

## **On the Fifth Cause of Action**

21

### **Plaintiff DOE Individually**

22

23

24   (1)    For rescission of contract;

25   (2)    For avoidance of contract;

26   (3)    For reformation of contract;

27   (4)    For orders enjoining enforcement of the contract;

28   (5)    For all costs of suit;

COMPLAINT — JURY TRIAL DEMANDED

(6)    For attorneys' fees;

(7)    For such other and further relief as the Court deems just and proper.

### **On the Sixth Cause of Action**

### **Plaintiff DOE Individually and all others Similarly Situated**

(1)    For avoidance of contract;

(2)    For orders enjoining enforcement of the contract;

(3)    For all costs of suit;

(4)    For injunctive relief;

(5)    For attorneys' fees;

(6)    For such other and further relief as the Court deems just and proper.

Dated: July 8, 2020                **BLADY WORKFORCE LAW GROUP APC**


                                     /s/ Benjamin Blady
                                    I. Benjamin J. Blady
                                    ATTORNEYS FOR
                                    Plaintiff DOE, individually, and for
                                    PEOPLE OF THE STATE OF CALIFORNIA

Dated: July 8, 2020                **LESCHES LAW**


                                     /s/ Levi Lesches
                                    Levi Lesches
                                    ATTORNEYS FOR
                                    Plaintiff DOE, individually, and for
                                    PEOPLE OF THE STATE OF CALIFORNIA

— **JURY DEMAND** —

Plaintiff hereby demands a jury trial with respect to all issues triable by jury.

Dated: July 8, 2020                    **BLADY WORKFORCE LAW GROUP APC**


                                       ___/s/ Benjamin Blady_____
                                       I. Benjamin J. Blady
                                       ATTORNEYS FOR
                                       Plaintiff DOE, individually, and for
                                       PEOPLE OF THE STATE OF CALIFORNIA

Dated: July 8, 2020                    **LESCHES LAW**


                                       ___/s/ Levi Lesches_____
                                       Levi Lesches
                                       ATTORNEYS FOR
                                       Plaintiff DOE, individually, and for
                                       PEOPLE OF THE STATE OF CALIFORNIA

COMPLAINT — JURY TRIAL DEMANDED